**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 09:27 AM October 18, 2013**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| TRINA RENEE MORRIS, | ) | CASE NO. 11-60657 |
| | ) | |
| Debtor. | ) | ADV. NO. 12-6133 |
| _____ | ) | |
| ANNE PIERO SILAGY, | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF OPINION,** |
| ANDY CHARLES MORRIS, | ) | **PROPOSED FINDINGS OF FACT** |
| | ) | **AND CONCLUSIONS OF LAW** |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Four motions are currently before the court: (1) Trustee's motion for summary judgment; (2) Defendant's motion to extend time or stay the time period for filing a responsive memorandum to Trustee's summary judgment motion; (3) Defendant's motion to extend time for discovery and filing of dispositive motions; and (4) Defendant's motion to strike the trustee's appraisal of the Real Estate. The central issue in this case revolves around the distribution of property in the divorce of the debtor Trina Renee Morris ("Trina" or "Debtor") and the defendant Andy Charles Morris ("Andy" or "Defendant"). Trustee argues that the transfer of property at divorce was unequal and satisfies the requirements for a fraudulent transfer, while Defendant

1

argues the opposite. Trustee seeks recovery of the transfer for the benefit of the estate.

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on April 4, 2012. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(H) and (O). There is a question of constitutional bankruptcy jurisdiction under <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011), which will be discussed below.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTS

The majority of the facts in this case are not in dispute. Trina and Andy were married on August 29, 1992. During their marriage, the couple acquired five parcels of land (collectively, "Real Estate")[1] and had two children together. On November 23, 2009, Trina was indicted on nine felony counts of theft and forgery relating to her former employer. On April 4, 2010 Trina's former employer also brought a civil suit seeking damages of $157,000. Trina pled guilty to the nine felony counts on May 6, 2010, and was ordered to pay restitution in the amount of $61,910. Trina's employer's insurance company, on September 1, 2010, brought a civil action against Trina seeking damages in the amount of $13,420. On December 29, 2010 Trina and Andy divorced pursuant to a Judgment Entry of Divorce, Separation Agreement, and Shared Parenting Plan (collectively, "Divorce Agreement").

Under the Divorce Agreement, Andy will receive the following assets free and clear of Trina's claims: the Real Estate with a fair market value of $390,755, a 2004 Ford F-350 truck, a 2000 GMC, a 1986 dump truck, and the complete interest in his business known as "CM Concrete." Trina, free and clear of Andy's claims, will receive a 2005 Ford Expedition.[2] The Divorce Agreement provides that Andy shall be responsible for all hospital debts, debts owed to Citifinancial, and mortgage debts with an estimated value of $125,050. Trina will be solely responsible for the debts incurred based on her fraudulent conduct of $61,910 with the potential for additional judgments of approximately $170,000, student loan payments, debts due to Capital One, debts due to The Sportsman Guide Visa, and the debt due on the 2005 Ford Expedition. The Divorce Agreement lists Andy's home as the primary residence of the two children, but each parent has custody of the children for an approximately equal amount of time. The Divorce Agreement also states that neither party will pay the other spousal support and that any right to future support is waived.

Approximately three months after the Divorce Agreement, on March 7, 2011, Trina filed a voluntary chapter 7 bankruptcy petition. Trustee filed a complaint on November 1, 2012 alleging that the transfer of the Real Estate in the Divorce Agreement was a fraudulent transfer.

---

[1] The five parcels of land are located in Holmes County, with parcel numbers: 08003732000, 2200136007, 2100578000, 2200136009, and 2200136010.
[2] Trustee does not argue, and therefore this court will not address, whether Debtor's conveyance of her interests, if any, in the 2004 Ford F-350, 2000 GMC, 1986 dump truck, and CM Concrete to Defendant were fraudulent transfers. Trustee's complaint only asks that the transfer of the Real Estate be deemed fraudulent.

2

Trustee filed her motion for summary judgment in support of her position on June 17, 2013. Andy filed his memorandum in opposition to summary judgment on July 1, 2013. Trustee then filed a reply in support of her motion for summary judgment on July 8, 2013. Trustee hopes to recover Trina's interest in the Real Estate that was transferred to Andy for the benefit of the bankruptcy estate. Andy has not filed a claim against the estate in the chapter 7 case.

One of two areas where the facts are in dispute relates to the value of the Real Estate. On June 17, 2013, Trustee obtained an appraisal of the Real Estate conducted by Robert J. Cerny ("Cerny Appraisal"), which lists the total value of the Real Estate at $390,755. The values of four of the five parcels in the Cerny Appraisal are not in dispute, but Defendant disputes the $170,000 valuation of the property described as Depot Street in Glenmont, Ohio. In a memo created before the finalization of the Cerny Appraisal ("Cerny Memo"), Mr. Cerny notes that the associated public records did not indicate any improvements on the Depot Street property. However, Cerny, during his inspection of the property around June 17, 2013, discovered a structure that was 30% complete. Cerny determined that the structure was only 15% complete at the time of the transfer in the Divorce Agreement. The Cerny Memo notes that as of January 7, 2011, the value of the Depot Street property was $170,000. However, the Cerny Memo also states that the "total replacement cost" of the property is $300,000 and at the date of the transfer the "contributory value" was $45,000. The meaning of "total replacement cost" and "contributory value" in the Cerny Memo are not immediately apparent. The Cerny Appraisal lists the value of the Depot Street property at $170,000 as of January 7, 2011, but later notes that "as of the effective date of the appraisal [the property] would be worth $100,000. With the land worth $50,000 and the contributory value of the house (15%) worth an additional $50,000." If Trustee's interpretation of the Cerny Appraisal is used, the fair market value of the Real Estate would be $390,755, leaving equity of $265,705 after subtracting associated mortgage debts. However, if Defendant's interpretation is used, any reduction in the value of the Depot Street property would reduce the equity in the Real Estate.

The second area where there are factual disputes is whether Defendant has sufficiently proven that he has separate property that should be excluded from the marital property. In the Divorce Agreement, Defendant did not list any separate property. Defendant first claims he has separate property in his response to Trustee's interrogatories. Defendant expands on his position in his objection to Trustee's motion for summary judgment, where he claims that he owned two tracts of land identified as 3042 Township Road and 12843 County Road 6 before his marriage to Debtor. Defendant claims he sold the 3042 Township Road property after the start of his marriage for $51,361, and the proceeds were used to purchase land located at the rear of 835 CR 520, in Glenmont, Ohio, and to make improvement to land located on Depot Street in Glenmont, Ohio. Both of these pieces of land are still owned by Defendant. Defendant also claims that on December 31, 2001 he transferred the 12843 County Road 6 property to his mother in exchange for $5,000, and Defendant used the proceeds to make improvements to marital property. In order to show the receipt of money from the above sales, Defendant provides a settlement statement showing he was entitled to the receipt of $51,361 for the sale of the 3042 Township Road property, as well as a signed letter from Defendant's mother that she paid Defendant $5,000 for the 12843 County Road 6 property. Defendant's only evidence of his use of the funds are statements in his affidavit. Trustee first disagrees with Defendant's claim that he received $5,000 from his mother for the 12843 County Road 6 property because Trustee argues that Defendant's

3

deposition claims that the property was transferred in satisfaction of the property's outstanding loan, and that cash was never received. Trustee also disagrees with Defendant's claims that he used the cash receipts from the sale of his separate property in a manner that maintains separate property status.

## LAW AND ANALYSIS

Motions for summary judgment are made under Federal Rule of Bankruptcy Procedure 7056, the bankruptcy complement to Federal Rule of Civil Procedure 56. To succeed on summary judgment, Rule 7056 requires the movant to "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. Pro. 7056. All evidence, facts and inferences are viewed in the light most favorable to the nonmoving party. Superior Bank v. Boyd (In re Lewis), 398 F.3d 735 (6th Cir. 2005) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).

Four motions are currently before the court: (1) Trustee's motion for summary judgment; (2) Defendant's motion to extend time or stay the time period for filing a responsive memorandum to Trustee's motion for summary judgment; (3) Defendant's motion to extend time for discovery and filing of dispositive motions; and (4) Defendant's motion to strike Trustee's appraisal of the Real Estate. Before the motions can be ruled upon, this court must first determine its jurisdictional limits under Stern v. Marshall, 131 S. Ct. 2594 (2011).

### I.     Bankruptcy Court Jurisdiction Under Stern v. Marshall

Trustee  has moved for summary judgment against Defendant on the theory that the transfer of the Real Estate in the Divorce Agreement was a fraudulent transfer as recognized by § 544 of the United States Bankruptcy Code or § 1336.04 of the Ohio Revised Code. However, before reaching the merits of the fraudulent conveyance claim, this court must first determine whether it has the jurisdictional power to enter a final order, propose findings of fact and conclusion of law to the district court, or neither. While neither party has objected to the bankruptcy court's jurisdiction in the current case, federal courts have the "duty to determine their own jurisdiction." Justice v. Bureau of Worker's Comp. (In re Justice), 224 B.R. 631, 633 (Bankr. S.D. Ohio 1998); see also Hamdi ex. rel. Hamdi v. Napolitano, 620 F.3d 615, 620 (6th Cir. 2010) ("Although neither party specifically addressed [jurisdiction] . . . we are under an independent obligation to examine [our] own jurisdiction." (internal quotation marks omitted) (second alteration in original)).

#### a.   The Bankruptcy Jurisdiction Framework

Bankruptcy courts have varying levels of authority to enter final judgments based upon an issue being classified as "core" or "noncore" to bankruptcy law. 28 U.S.C. § 157 (2012). Under the United States Code, in a core proceeding the bankruptcy judge "may enter appropriate orders and judgments," but such judgments are subject to appellate review by the federal district court. Id. § 157(b)(1). Examples of actions that are considered "core" are:

4

> (A) matters concerning the administration of the estate; (B) allowance or disallowance of claims against the estate or exemptions from property of the estate . . . (F) proceedings to determine, avoid, or recover preferences . . . *(H) proceedings to determine, avoid, or recover fraudulent conveyances . . . .*

Id. § 157(b)(2) (emphasis added). However, in noncore proceedings, instead of entering an order, the bankruptcy judge "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after . . . reviewing de novo" Id. § 157(c)(1). A noncore issue is one "that is otherwise related to a case under title 11," but is not deemed to be "core" as defined above. Id.

Under 28 U.S.C. § 157(b)(2)(H), a proceeding "to determine, avoid, or recover fraudulent conveyances" is core to a bankruptcy case. Therefore, a claim brought under 11 U.S.C. § 548, which is the specific bankruptcy code section dealing with fraudulent conveyances, is "undoubtedly a core proceeding." Appalachian Fuels, LLC v. Energy Coal Res., Inc. (In re Appalachian Fuels, LLC), 472 B.R. 731, 739 (Bankr. E.D. Ky. 2012). A fraudulent conveyance claim brought under state law pursuant to 11 U.S.C. § 544 is also core, as "the claim still arises under [the bankruptcy code] because it is the bankruptcy code that transfers the cause of action from the creditor to the trustee." XL Sports, Ltd. v. Lawler, 49 Fed. App'x. 13, 21 (6th Cir. 2002) (unreported). See also Bliss Techs, Inc. v. HMI Indus, Inc. (In re Bliss Techs., Inc.), 307 B.R. 598, 604–05 (Bankr. E.D. Mich. 2004).

However, that is not the end of the analysis, as constitutional concerns about the separation of powers, even for "core" matters, may further limit a bankruptcy judge's ability to enter a final order. Article III of the United States Constitution "mandates that '[t]he judicial Power of the United States, shall be vested' in courts whose judges 'shall hold their Offices during good Behaviour' and 'receive for their Services[ ] a Compensation [ ] [that] shall not be diminished during their tenure.'" Waldman v. Stone, 698 F.3d 910, 917 (6th Cir. 2012) (quoting U.S. Const. art. III, § 1). The requirement that judges in the federal judiciary have both tenure and salary protected is "an inseparable element of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch." Stern, 131 S. Ct. at 2608. Bankruptcy judges lack equivalent tenure and salary protection. Waldman, 698 F.3d at 917.

Because bankruptcy judges do not retain all of the essential protections of an Article III judge, "Congress may not withdraw from [an Article III judge] any matter that was the subject of a suit at common law, or in equity, or admiralty" and give it to a bankruptcy judge. Stern, 131 S. Ct. at 2609 (internal quotation marks omitted). However, in Northern Pipeline, 458 U.S. 50, 67–70 (1982), the Supreme Court recognized a category of cases involving "public rights" that Congress is constitutionally allowed to assign to a bankruptcy court for resolution. A "public right" is a claim "that derives from a federal regulatory scheme, or in which resolution of the claim by an expert governmental agency is essential to a limited regulatory objective within the agency's authority." Stern, 131 S. Ct. at 2613. A "private right," which is traditionally defined as "the liability of one individual to another under the law," cannot be removed by Congress from Article III adjudication. Id. at 2612. Private rights include any suit at common law in which a

5

jury trial could be requested. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 55–56 (1989); see also Stern, 131 S. Ct. at 2609 ("When a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law—to the Judiciary." (internal citations and quotation marks omitted)).

To determine if a bankruptcy judge's entry of final judgment in a core fraudulent conveyance claim is unconstitutional, it must be decided whether fraudulent conveyance actions fall under the "public rights" exception. In Northern Pipeline, the Supreme Court stated that a public right is an exception that applies only to matters between the government and an individual "in connection with the performance of the constitutional functions of the executive or legislative departments." 458 U.S. at 67–68 (holding that damages for breaches of contract, warranty, misrepresentation, coercion, and duress were not "public rights" and must be decided by an Article III judge).  Later, the Supreme Court removed the requirement that the claim include the government as a party, but continues to limit the exception to issues that derive from a federal regulatory scheme. Stern, 131 S. Ct. at 2613; see also Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 585 (1985) ("[Congress] may create a seemingly private right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." (internal quotation marks omitted)). Many courts have difficulty in determining which legal actions are private rights and which are public rights. See e.g., Stern, 131 S. Ct. at 2615 ("[O]ur discussion of the public rights exception . . . has not been entirely consistent"); Northern Pipeline, 458 U.S. at 70 ("The distinction between public rights and private rights has not been definitively explained in our precedents."); Waldman, 698 F.3d at 918 ("The law in [the public/private rights] area has a potluck quality.").

In the bankruptcy context, the Supreme Court has decided a number of cases outlining the limits of bankruptcy jurisdiction under the "public rights" theory. Starting with the older cases and working towards the present, the relevant Supreme Court decisions are as follows: Katchen v. Landy, 382 U.S. 323, 330 (1966), holding, without an explicit discussion of public or private rights, that a bankruptcy court could decide an action for a voidable preferential transfer; Northern Pipeline, 458 U.S. 50, holding that actions for breach of contract, warranty, misrepresentation, coercion and duress are not public rights; Granfinanciera, 492 U.S. 33, holding that a fraudulent conveyance case is not a public right when the defendant has not filed a proof of claim in the bankruptcy case; Langenkamp v. Culp, 498 U.S. 42 (1990) (per curiam), holding that if the defendant in a preference action filed a proof of claim, then the case falls within the public rights exception; and Stern, 131 S. Ct. 2594, holding that a counterclaim in a bankruptcy case for tortious interference is not a public right. The common theme is that if the action would necessarily be resolved within the bankruptcy framework, then the action is a public right. Stern, 131 S. Ct. at 2618. Such a rule distinguishes Granfinanciera (holding that a fraudulent conveyance is a private right when no proof of claim is filed) from Langenkamp (holding that a preferential transfer is a public right when a proof of claim is filed) because once a proof of claim is filed, the related fraudulent conveyance or preference action must be resolved within the claims allowance process. However, if a claim is not filed against the estate,

6

fraudulent conveyance claims are "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." Granfinanciera, 492 U.S. at 56. Further solidifying this conclusion is the Supreme Court's statement that "[h]e who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide by the consequences of that procedure." Stern, 131 S. Ct. at 2616. The relevant distinction is whether the action seeks to augment the bankruptcy estate, which must be determined by an Article III judge, or if the action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process, which can be determined by a bankruptcy judge. See id. at 2619; Granfinanciera, 492 U.S. at 58–59. The Sixth Circuit summarized bankruptcy jurisdiction law as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate . . . the bankruptcy court's authority is at its constitutional maximum. But when a debtor pleads an action arising only under state-law . . . or when the debtor pleads an action that would augment the bankrupt estate, but not necessarily be resolved in the claims allowance process, then the bankruptcy court is constitutionally prohibited from entering final judgment.

Waldman, 698 F.3d at 919 (internal citations and quotation marks omitted).

Based on the above, a fraudulent conveyance action can be either a public or private right. If the defendant in the fraudulent conveyance action has not filed a claim against the estate, then an action to recover property does not arise from the bankruptcy itself, is instead primarily to augment the estate, and must be determined by an Article III judge. See Granfinanciera, 492 U.S. at 58–59. However, if the defendant has filed a claim against the bankruptcy estate, then determining the validity of the fraudulent conveyance would be resolved in the claims allowance process and the claim can be determined by a bankruptcy judge. See id.

In the current case, Defendant has not filed a claim against the estate. If Defendant had filed a claim, "[i]t is crystal clear that the bankruptcy court [would have] constitutional jurisdiction under Stern to adjudicate whether [the transaction] was a fraudulent transfer." Onkyo Eur. Elecs. GMBH v. Global Technovations, Inc. (In re Global Technovations Inc.), 694 F.3d 705, 722 (6th Cir. 2012) (internal quotation marks omitted). However, because a claim was not filed, the validity of the fraudulent conveyance would not "necessarily be resolved in the claims allowance process" and therefore falls outside core bankruptcy jurisdiction. Stern, 131 S. Ct. at 2618. The Supreme Court addressed the same issue in Granfinanciera, 492 U.S. 33. In the case, Granfinanciera, S.A., as well as other entities, received fraudulent transfers from a company that later filed for reorganization under chapter 11. Id. at 36. Even though the fraudulent transfer was core under the bankruptcy code, the Supreme Court held that the bankruptcy court violated the Constitution when it entered a final order on the fraudulent conveyance claim. See generally id. The Court noted that a fraudulent conveyance action is normally a "private right," but if the defendant has submitted a claim against the bankruptcy estate, then "the issue arises as part of the process of allowance and disallowance of claims" and a bankruptcy court is able to enter

7

final judgment. Id. at 58. Because Defendant has not filed a claim in the current case, the bankruptcy court is unable to enter final judgment on the fraudulent conveyance action.

The next issue is what action a bankruptcy judge may take when a claim is core under the bankruptcy code but the judge is constitutionally prohibited from entering final judgment. If the claim were noncore, the bankruptcy judge may hear the proceeding and "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions [of law]." 28 U.S.C. § 157(c)(1). However, for core proceedings, a bankruptcy judge "may hear and determine . . . all core proceedings arising under [the bankruptcy code]." Id. § 157(b)(1). The combination of the statutory language and the Supreme Court's decision in Stern leaves a "gap" in the bankruptcy code. Waldman, 698 F.3d at 921–22; Exec. Benefits Ins. Agency v. Arkinson (In re Bellingham Ins. Agency, Inc.), 702 F.3d 553, 555 (9th Cir. 2012). In other words, if the issue is noncore, the bankruptcy judge may submit findings of fact and conclusions of law to the district court, who then makes a final decision. Waldman, 698 F.3d at 921–22. However, for a core matter where the bankruptcy judge is constitutionally prohibited from entering a final order, there is no corresponding statutory authority to submit information to the district court for a final decision. Id. (noting that the bankruptcy code allows for the bankruptcy court to "*enter* appropriate orders and judgments," not to propose them (emphasis added)); In re Bellingham, 702 F.3d at 565 ("Nowhere does the [bankruptcy code] explicitly authorize bankruptcy judges to submit proposed findings of fact and conclusions of law in a core proceeding.").

To resolve this "gap," this court holds that a bankruptcy court is able to propose findings of fact and conclusions of law to the district court in core matters where the bankruptcy judge is constitutionally prohibited from entering a final judgment. The court so finds for the following reasons. First, when Congress created a non-exhaustive list of core matters within 11 U.S.C. § 157(b)(2), it was done "with a view towards expanding the bankruptcy court's jurisdiction to its constitutional limit." Duck v. Munn (In re Mankin), 823 F.2d 1296, 1301 (9th Cir. 1987). Therefore, "the bankruptcy courts must be vested with as much adjudicatory power as the Constitution will bear." In re Bellingham, 702 F.3d at 565. The statute gives a bankruptcy judge the power to "hear and determine" core matters, and based on the statutory objective of expansive jurisdiction, the greater power to "hear and determine" must include the lesser power to submit information to the district court. Id. Second, according to the Supreme Court, Stern "did not change all that much." 131 S. Ct. at 2620. The Supreme Court noted that the removal of certain types of claims from a bankruptcy judge will not "meaningfully change[] the division of labor" in federal courts. Id. at 2620. However, removing a bankruptcy judge's ability to entertain claims outside his constitutional authority, and then submit his findings to the district court, would significantly increase the district court's work. See In re Bellingham, 702 F.3d at 566. For example, if a bankruptcy judge obtains significant legal and factual information about a state law counterclaim over the course of a bankruptcy proceeding (as in Stern), not allowing that information to be passed to the district court would require additional fact finding and legal research, which would increase the district court's workload. Therefore, the Stern court was not prohibiting the bankruptcy court from hearing and proposing findings to the district court, but instead only from entering final judgments. See Stern, 131 S. Ct. at 2620.

8

Most courts to reach the "gap" issue have ultimately decided that the bankruptcy court is able to submit proposed findings of fact and conclusions of law to the district court. Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman LLP), 464 B.R. 348, 355–56 (Bankr. N.D. Cal. 2011) (noting the near unanimous holding that bankruptcy courts are able to submit proposed findings of fact and conclusions of law even when entering final judgment would be unconstitutional). The Sixth Circuit, in dicta, appears to agree as it noted that "the most practical remedy" to the gap problem is to allow the bankruptcy court to propose findings of fact and conclusions of law to the district court. Waldman, 698 F.3d at 921. Therefore, on issues that are core to the bankruptcy case but a bankruptcy judge cannot constitutionally enter final judgment, the bankruptcy court may propose findings of fact and conclusions of law to the district court for de novo review and the district court may "accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Fed. R. Bankr. P. 9033(d).

The last jurisdictional issue is whether a party can consent, either expressly or impliedly, to the bankruptcy court entering a final order in a core matter that would normally be prohibited by Stern. There is currently a circuit split on this issue. The Ninth Circuit decided that a party can waive a constitutional Stern problem, because if a bankruptcy judge can decide a non-core proceeding with the necessary consent, "then it surely permits the same judge to decide a core proceeding" with the same consent. In re Bellingham, 702 F.3d at 567. The Sixth and Seventh Circuits have also reached the issue and determined that a party cannot consent to a constitutional Stern limitation because of the structural role of separation of powers in the United States government. Waldman, 698 F.3d 910; Wellness Int'l Network, Ltd. v. Sharif, 2013 WL 4441926 (7th Cir. 2013). As the Sixth Circuit is binding on this court, a party may not consent to allow a bankruptcy court to enter a final order in a core action where the bankruptcy court would otherwise be prohibited by Stern. Waldman, 695 F.3d 910.

## II.    Trustee's Motion for Summary judgment on the Fraudulent Transfer Claim

Having decided that the bankruptcy court can submit findings of fact and conclusions of law to the district court in the current case, the court will now address Trustee's motion for summary judgment on either an actual or constructive fraudulent transfer claim. Trustee requests summary judgment based on Debtor's transfer of assets to Defendant and assumption of debts under the Divorce Agreement. The bankruptcy code defines a fraudulent transfer as follows:

> **(a)(1)** The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
> **(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> **(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and

**(ii)(I)** was insolvent on the date that such transfer was made or
such obligation was incurred, or became insolvent as a result of
such transfer or obligation . . . .

11 U.S.C. § 548.

### a. The Divorce Agreement Does Not Have Preclusive Effect

Before turning to whether Defendant engaged in an actual or constructively fraudulent
transfer, this court must determine what preclusive effect, if any, the state court's entry of the
Divorce Agreement will have. Defendant argues that this court should hold that the Divorce
Agreement resulted in a fair distribution of assets because it was approved by a state court.
Courts often defer to separation agreements incorporated into state court orders following hotly
contested state court proceedings. Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 212–13
(5th Cir. 2003) (holding that a separation agreement that was fully litigated without any
suggestion of collusion "should not be unwound by the federal courts merely because of its
unequal division of marital property"); see also 5 Collier on Bankruptcy, ¶ 548.01[2][B] (Alan
N. Resnick & Henry J. Sommer eds., 16th ed. 2013). However, if the marital property is
distributed via a consensual property settlement agreement, "rather than through a vigorously
litigated proceeding in which the Family Court has to act as arbiter," the trustee may be able to
set aside any transfer made in the agreement as a fraudulent conveyance.[3] See Reisz v. Stinson
(In re Stinson), 364 B.R. 278, 280–82 (Bankr. W.D. Ky. 2007). Within the Sixth Circuit, even if
a settlement agreement is entered in order to avoid what is expected to be a hotly contested
divorce, the distribution of property in the separation agreement may still be a fraudulent
transfer. Suhar v. Bruno (In re Neal), 478 B.R. 261 (B.A.P. 6th Cir. 2012) (holding that when an
ex-wife divorced her ex-husband to marry another man, the ex-wife's decision to enter into a
separation agreement that gave her ex-husband a significantly larger portion of the marital
property so she could quickly end the marriage, "move on with her life," and avoid a hotly
contested divorce, was still a fraudulent transfer).

There are also differences between the goals of a state court when reviewing a divorce
agreement (obtaining an equitable distribution) and a bankruptcy court (reasonable equivalence).
In the bankruptcy arena, the most important factor in reasonable equivalence is the difference in
value between what is given and what is received. Silagy v. Gagnon (In re Gabor), 280 B.R. 149,
158 (Bankr. N.D. Ohio 2002). However, a state court will look to the duration of the marriage,
the desirability of awarding the family home to the spouse that will care for the children,
liquidity, and other factors. O.R.C. § 3105.171(F). Because "the standards for measuring the
fairness of a property division in the domestic relations arena and reasonably equivalent value in
a fraudulent transfer case are separate and distinct," a bankruptcy court is not bound by the state
court's distribution of marital property.[4] Corzin v. Fordu (In re Fordu), 201 F.3d 693, 707 (6th
Cir. 1999) (holding that a domestic relations court "could produce a division of marital property

---

[3] A bankruptcy court is not normally prohibited from reviewing a state court divorce decision under the doctrines of
res judicata or collateral estoppel. In re Erlewine, 349 B.R. at 210–11; Corzin v. Fordu (In re Fordu), 201 F.3d 693,
702–07 (6th Cir. 1999).
[4] For example, a settlement agreement's unequal distributions of property may very well be in the best interest of the
prior marriage's children, but such a distribution could still be fraudulent under the bankruptcy code.

10

that would satisfy the requirements of Ohio Rev. Code Ann. § 3105.171(F), yet not pass muster under the reasonable equivalence test"). Therefore, "a bankruptcy court in the Sixth Circuit is not bound by any recitations in a marriage dissolution decree" and instead "must independently analyze the transfers to determine if the debtor received reasonably equivalent value." In re Neal, 478 B.R. at 271.

In the current case, Debtor and Defendant entered into a Divorce Agreement on December 29, 2010. Unlike Erlewine, the result did not follow four days of trial. Defendant was represented by counsel and Debtor was not. There are additional countervailing facts discussed hereinafter. Taken together, it is clear that this was not a result wrought by a thorough struggle in the adversary process. Based on the above, the bankruptcy court need not give any undue deference to the Divorce Agreement and will instead make an independent judgment on whether the distribution of assets in the Separation Agreement resulted in a fraudulent transfer.

### b. Trustee's Constructive Fraudulent Transfer Claim

To prove constructive fraud under § 548(a)(1)(B) the trustee must prove four elements: "(1) the debtor transferred an interest in property, (2) the transfer took place within two years before the bankruptcy case was filed, (3) the debtor received less than reasonably equivalent value, either voluntarily or involuntarily, and (4) the debtor was insolvent on the date the transfer was made or became insolvent as a result of the transfer." In re Neal, 478 B.R. at 270. It is important to note that under a constructive fraud theory, it is not necessary to prove that Debtor had the intent to hinder, delay, or defraud creditors, only that the four above factors are satisfied. Richardson v. Markin (In re Checker Motors Corp.), 495 B.R. 355, 362 (Bankr. W.D. Mich. 2013). The trustee bears the burden of proof for each element by a preponderance of the evidence. Id.

In the current case, the first, second, and fourth elements of a constructive fraud claim are easily satisfied. Debtor's conveyance of her interest in the Real Estate undoubtedly represents the transfer of an interest in property. Debtor and Defendant divorced in December, 2010 and Debtor filed for bankruptcy in March, 2011, well within the two year statutory period. Additionally, Debtor was either insolvent at the time of the Real Estate transfer or became insolvent as a result of the transfer. Schedule B of Debtor's bankruptcy petition lists Debtor's total personal property at $6,475 and Schedule F lists debts totaling $226,287. The contested issue is whether the Divorce Agreement resulted in Debtor receiving reasonably equivalent value. Based on the discussion below, the court finds that Debtor did not receive reasonably equivalent value. All of the requirements for a constructively fraudulent transfer are satisfied.

### (1) Reasonably Equivalent Value

Determining if a debtor has received reasonably equivalent value has two separate inquiries: "(1) was there a receipt of what may properly be considered 'value;' and (2) was that value reasonably equivalent to what was transferred." In re Stinson, 364 B.R. at 282. The bankruptcy code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2). The Divorce Agreement's distribution of property clearly satisfied the "value" requirement. See Brenna v. Slone (In re Fisher), 296 Fed.

11

App'x. 494, 501 (6th Cir. 2008); In re Stinson, 364 B.R. at 282–83. The next issue, whether reasonably equivalent value was given, is made more complex by the distribution of assets and assumptions of debts by both parties. "[T]he test used to determine whether a transfer was supported by reasonably equivalent value focuses on whether there is a reasonable equivalence between the value of property surrendered and that which was received in exchange." In re Fisher, 296 Fed. App'x. at 501. The Divorce Agreement can be considered in its entirety when determining if reasonably equivalent value has been given. See In re Fordu, 201 F.3d at 708.

Defendant and Debtor distributed their assets upon divorce under a jointly agreed to Divorce Agreement. Trustee argues that Debtor did not receive reasonably equivalent value for the transfer of real property from Debtor to Defendant in the Divorce Agreement. Defendant, in contrast, makes five arguments that, in his opinion, establish that the transfer of property was for reasonably equivalent value. This court rejects three of Defendant's arguments, allows an adjustment for sales expense, and may allow an adjustment based on the Cerny Appraisal. However, even when all evidence, facts, and inferences are viewed in the light most favorable to Defendant, reasonably equivalent value has not been given. See Infra Part III.

### i. Waiver of Child Support

Defendant argues that his agreement to waive his right to child support in the Divorce Agreement constitutes $60,050 in value to Debtor. In this situation, there is a question as to whether "value" was given under the bankruptcy code, as the code defines value as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).

Assuming value has been given, the issue still remains as to what constitutes reasonable equivalence. Under common interpretations of the bankruptcy code, almost any benefit to the debtor, either direct or indirect, can constitute reasonably equivalent value. 5 Collier on Bankruptcy, ¶ 548.03[5]; see also Chomakos v. Hilton (In re Chomakos), 69 F.3d 769 (6th Cir. 1995) (holding that when the defendants made wagers in a Las Vegas casino, even though the odds were significantly stacked against them, the chance that the debtors could come home with greater sums constituted the return of reasonably equivalent value for their wagers). However, a party has not received reasonably equivalent value "when the debtor receives only an illusory promise in return" as "there must be some legitimate and reasonable chance of return." Frank v. Kiesel (In re Denison), 292 B.R. 150, 154 (E.D. Mich. 2003). For example, in a case before the Third Circuit, when the insolvent debtor paid $515,000 in commitment fees towards a loan that had almost no chance of being closed, the "parties' almost certain knowledge at the time the fees were paid that the . . . condition[s] would not be met rendered the value of the loan essentially illusory, and therefore not reasonably equivalent to the fees being paid." Mellon Bank, N.A. v. The Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 154–55 (3rd Cir. 1996) (cited favorably in In re Denison, 292 B.R. at 154–55).

The court concludes that reasonably equivalent value could not have been given by Debtor to Defendant in this circumstance. Debtor has recently been convicted of fraud and her former employer won a restitution judgment of over $60,000. Additionally, she faces the

possibility of significantly larger civil judgments. Because of the fraud, Debtor has lost her employment, and this court believes it will be near impossible for Debtor to find a similarly paying job. For these reasons, the court finds that the waiver of child support payments is illusory and of no value to Defendant.

More importantly, Debtor should not be able to reduce the amount she will pay to her current creditors by either obtaining a waiver of a future obligation or withholding money to satisfy a future debt. For example, a debtor should not be allowed to set aside money for her next five years of rent under the guise that the money will be used to pay her future creditor (the landlord) at the expense of her current creditors. In In re Strasser, a debtor moved $62,000 out of reach of her current creditors by transferring the money to her father, who then gave the money back to the debtor for the payment of her living expenses. 303 B.R. 841, 847–48 (Bankr. D. Ariz. 2004). The court held that the debtor should not be able to harm her current creditors by withholding money under the guise that the property would be used to pay her future expenses, and therefore her future creditors. Id. Such an action is putting money out of the reach of current creditors, and then claiming "no harm no foul, I used it on my future creditors." Id. (internal quotation marks omitted). While the facts are different in the current case, the theory is the same: Debtor is not allowed to give significant value to her future creditors in order to harm her current creditors. For the above reason, the court will not consider the waiver of the child support in calculating reasonable equivalence.

### ii.     Cost of Selling the Real Estate

Defendant argues that if he is forced to return Debtor's one half interest in the Real Estate, he could only raise the needed funds through the sale of the Real Estate. See Slone v. Dirks (In re Dirks), 407 B.R. 442, 2009 WL 103606, at *8 (B.A.P. 6th Cir. 2009) (unpub. table decision). Under the Ohio Code, the cost of sale "if it is necessary . . . to effectuate an equitable distribution of property," shall be considered by the court. O.R.C. § 3105.171(F)(7). Defendant claimed a 10% reduction and Trustee does not dispute this point. The court finds that Defendant is entitled to deduct one-half of the cost of sale, set at 10% of the fair market value of the real estate, from what he received under the Divorce Agreement. Therefore, Defendant is able to deduct $19,538[5] from the value of the Real Estate. Defendant is only able to deduct one-half of the cost of a sale because the purpose of the statute is to reach an "equitable distribution of property." Id. If the transaction is avoided as a fraudulent transfer, and the Real Estate is sold to return Debtor's portion, evenly splitting the cost of the sale will result in both Debtor and Defendant realizing the same proceeds.

### iii.     The Accuracy of the Trustee's Land Appraisal

The Divorce Agreement, which transferred the Real Estate from Debtor to Defendant, occurred on December 29, 2010. However, the Cerny Appraisal did not occur until July 25, 2013 (approximately two and one-half years later). On the date of the Divorce Agreement a structure was 15% completed on the Depot Street property, but by the date of the Cerny Appraisal the

---

[5] The appraised value of the property is $390,755, 10% of which is $39,075. One-half of $39,075 is approximately $19,538. Because the sales expense is based on 10% of the fair market value from the Cerny Appraisal, this amount could change based on the court's interpretation of the appraisal.

13

structure was 30% complete. Defendant argues that the Cerny Appraisal improperly values the Depot Street property due to the difficulties caused by the changes in construction between the time of the Divorce Agreement and the Cerny Appraisal. The Cerny Appraisal, which specifically notes the partially completed structure and the need to assess the value of the property as of the Divorce Agreement, estimated the value of the Depot Street property to be $170,000 as of January 7, 2011.[6] Trustee argues that the $170,000 value from the Cerny Appraisal should be used. In contrast, Defendant argues that Cerny Memo's "contributory value" amount of $45,000 should be applied as a discount to the Cerny Appraisal valuation. Trustee's response is that the "contributory value" is Cerny's estimation of the structure's value as of January 7, 2011, which when combined with the value of the land, arrives at the $170,000 figure. The notes accompanying the Cerny Appraisal only add to the confusion, as Cerny indicates that as of the effective date of the appraisal, which is January 7, 2013, "the land [is] worth $50,000 . . . and the contributory value of the house (15%) [is] worth an additional $50,000," which would result in a total valuation of $100,000.

When viewing the Cerny Appraisal's valuation of the Depot Street property in the light most favorable to Defendant, a genuine issue of material fact exists as to the Depot Street property's value as of January 7, 2011. Based on the above, the valuation of the Depot Street property is either $170,000 (Trustee's interpretation of the Cerny Appraisal), $125,000 (Defendant's valuation after subtracting the "contributory value"), or $100,000 (the Cerny Appraisal notes). After accounting for the differences in the Depot Street property valuations, the equity in the Real Estate could be $265,705, $220,705 or $195,705, respectively.

### iv.    Separate Property or Marital Property

If assets are classified as separate property, those assets are not split between spouses at divorce. Defendant argues that portions of the Real Estate were not marital property, but were instead separate property. In Ohio, unless an exception applies, marital property is "[a]ll real and personal property that currently is owned by either or both of the spouses." O.R.C. § 3105.171(A)(3)(a)(i). Therefore, during marriage, all property is presumed to be marital property. Ruetz v. Ruetz, 2003 WL 21781604, at *6 (Ohio App. 6th 2003). However, "any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage" is separate property. O.R.C. 3105.171(A)(6)(a)(ii). The party seeking to establish that an asset is separate property bears the burden of proof. Ruetz, 2003 WL 21781604, at *6. If separate property is sold during the marriage, and the proceeds from the sale can be directly traced to the purchase of another asset (such as real property), the new asset is also separate property. See id. Before a party can obtain separate property status, evidence tracing the new asset to funds acquired from the sale of property acquired before the marriage must be present. Id.; see also O.R.C. § 3105.171(A)(7)(b) ("The commingling of separate property with other property does not destroy the identity of the separate property as separate property, *except when the separate property is not traceable*" (emphasis added)). "[T]raceability has become the focus when determining whether separate property has lost its separate character

[6] The court notes that there is a slight difference between the date of the Divorce Agreement (December 29, 2010) and the effective date of the Cerny Appraisal (January 7, 2011). As there is no evidence of any major changes in the Real Estate's value between the two dates, the nine day difference immaterial.

14

after being commingled with marital property." Peck v. Peck, 96 Ohio App.3d 731, 735 (Ohio App. 12th 1994).

The cases are inconsistent within Ohio as to whether or not the party with the burden of proof must present documentary evidence of a separate property claim, or whether oral testimony alone can be sufficient. Stanley Morganstern & Beatrice Sowald, Baldwin's Ohio Practice Ohio Domestic-Relations Law, § 12:10 (4th ed. 2012) (noting that "[o]ral testimony as evidence of separate property, without documentary proof, may or may not be sufficient to carry the burden" (footnotes omitted)). A number of cases have determined that documentary evidence is not required as a matter of law, but trial courts still normally find that the party presenting only oral tracing evidence has failed to reach the required burden of proof. Peck, 96 Ohio App.3d at 735 (holding that where it was agreed that the marital residence was purchased with separate property proceeds, because there was no direct transactional evidence tracing the financial history of the marital residence back to separate property, "the trial court was within its discretion in concluding that, due to the lack of supporting evidence, appellant's claim for separate property was not sufficiently traced"); Slutzker v. Slutzker, 1994 WL 822539, at *4–5 (Ohio App. 5th 1994) (holding that sworn financial statements, an antenuptial agreement, and testimony that all assets in a trust came from separate property was sufficient to prove that the trust was separate property, even without documentary evidence tracing specific transactions); Ramirez v. Ramirez, 1996 WL 748167, at *2 (Ohio App. 6th 1996) (holding that the trial court was within its discretion to deny a separate property claim when there was only oral tracing testimony, but the court did not explicitly require documentary evidence). However, other cases hold that "the party seeking to establish an asset as separate property *must* present at least some documentary evidence tracing the asset back to its nonmarital status." Reutz, 2003 WL 21781604, at *6 (emphasis added) (holding that a husband with $50,000 in a retirement account that was separate property did not sufficiently trace a $5,000 withdrawal from the retirement account used to make a down payment on the marital home because "the record contains no receipts or other documents showing either the withdrawal of funds from [husband's] retirement account, or the use of funds from the account as a down payment"); Kreilick v. Kreilick, 161 Ohio App.3d 682, 687–88 (Ohio App. 6th 2005) (holding that the trial court abused its discretion when it determined that $6,000 in separate property used to remodel a home retained its separate property status based solely on oral testimony).

In the current case, Defendant presents documentary evidence that he sold two pieces of separate property for $51,361 and $5,000, respectively. Trustee agrees that the two pieces of real estate are separate property, but believes there is insufficient evidence tracing the separate property to Defendant's current property. Defendant provided no documentary evidence showing that the sale price of the separate property was actually received or what account the funds were deposited into. Defendant relies entirely on his own affidavit as evidence that he used the proceeds from the sale of separate property to acquire and make improvements to the Real Estate. If Defendant had provided the court with documentary evidence of the sale amounts being deposited into a bank account and the withdrawal of the funds from the same account to pay for the acquisition and improvements to the Real Estate, the necessary direct evidence would be present. No such documentary evidence is present. However, based on the following two paragraphs, this court need not decide whether documentary evidence is required as a matter of

15

law in an Ohio separate property claim because Defendant's separate property contradiction bars such a claim.

At the summary judgment stage the court will normally view facts and allegations in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2009). However, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous statement . . . without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). The Sixth Circuit has taken the holding from Cleveland and developed it into a two-part test to determine if the court should consider a contradiction to a previous statement: (1) are the current and former statements in direct conflict; and (2) if yes, has the nonmoving party provided a "persuasive justification" for the contradiction. Aerel, S.R.L. v. PCC Airfoils, LLC, 448 F.3d 899, 908–09 (6th Cir. 2006). For example, in E.E.O.C. v. Burlington Northern & Santa Fe Ry. Co., a contradiction was found between the plaintiff's previous claim for Social Security Disability Insurance ("SSDI") and his current American's with Disabilities Act ("ADA") claim. 621 F.Supp. 2d. 587, 600 (W.D. Tenn. 2009). Unless the nonmoving party could provide a sufficient justification for the contradiction the court would grant summary judgment. Id. While the rule from Cleveland and E.E.O.C. is normally applied to claims for disability benefits, the Sixth Circuit has also applied it in other situations, such as police testimony and products liability. See Hanson v. City of Fairview Park, Ohio, 340 Fed. App'x. 70, 74 (6th Cir. 2009); Yanovich v. Zimmer Austin, Inc., 255 Fed. App'x. 957, 960–62 (6th Cir. 2007).

In the current case, Defendant first specified that he had no separate property in the Divorce Agreement filed in December of 2010, but contradicted that statement in his answer to Trustee's interrogatories in March of 2013 and in his memorandum in opposition to Trustee's motion for summary judgment on July 1, 2013. Defendant's failure to list any separate Property in the Divorce Agreement, and later claiming portions of the Real Estate are separate property, is a direct conflict satisfying the first element of the Aerel test. Defendant has not provided any explanation for the contradiction, much less a "persuasive justification," satisfying the second element from Aerel. Therefore, this court rejects Defendant's separate property claim based on his direct and unexplained separate property contradiction.[7]

### v. Defendant's Assumption of Marital Debt

Defendant argues that his assumption of unsecured marital debts should be offset against the assets he received in the Divorce Agreement. In Ohio, "debt incurred during [] marriage is presumed to be marital debt." In re Neal, 478 B.R. at 268. However, creditors are not bound by any determination of liability made by a domestic relations court, and are instead bound only by the contractual relationship between the parties. Id. at 274. This means that the assumption of debt by one spouse in a divorce agreement, when that spouse is solely liable on that debt, conveys no benefit onto the other spouse. Id. Additionally, if both spouses are liable on the debt, the creditor can seek recovery from either party regardless of the allocation of debt in the a

---

[7] An noted in the Facts section, Trustee alleges the existence of a contradiction in Defendant's deposition regarding the $5,000 payment for the 12843 County Road 6 property. As the separate property contradiction in the Divorce Agreement covers Defendant's alleged deposition contradiction, the deposition contradiction need not be discussed.

divorce agreement. Id. Therefore, the Bankruptcy Appellate Panel for the Sixth Circuit determined that the assumption of debt should not be included in a reasonable equivalence calculation, as Debtor and Defendant were "either not contractually liable for the debt or, if [they were], [they] remained liable for the debt despite [the other parties'] assumption thereof." Id.

As stated above, the elements of a constructively fraudulent transfer are: "(1) the debtor transferred an interest in property, (2) the transfer took place within two years before the bankruptcy case was filed, (3) the debtor received less than reasonably equivalent value, either voluntarily or involuntarily, and (4) the debtor was insolvent on the date the transfer was made or became insolvent as a result of the transfer." In re Neal, 478 B.R. at 270. Because this court concludes that reasonably equivalent value has not been given, which was the only element Defendant contested, Trustee is entitled to summary judgment on her constructive fraudulent transfer claim under § 548(a)(1)(B).

### c. Trustee's Actual Fraudulent Transfer Claim

In addition to the constructive fraud claim, Trustee also asserts a claim of an actual fraudulent transfer. The elements are as follows: "(1) that there was a transfer of an interest of the debtor in property; (2) that the transfer occurred within [two] year[s] prior to the date of the filing of the bankruptcy petition; and (3) that the transfer was made with the actual intent to hinder, defraud or delay." In re Fisher, 362 B.R. at 887; see also 11 U.S.C. § 548(a)(1)–(a)(1)(A). As noted in the section pertaining to a constructively fraudulent transfer, elements (1) and (2) are satisfied. The disputed element is whether Debtor made the transfer in the Divorce Agreement with "actual intent to hinder, delay, or defraud." 11 U.S.C. § 548(a)(1)(A).

Fraudulent intent is rarely proven by direct evidence. In re Gabor, 280 B.R. at 157. In order to combat this problem, courts have developed "badges of fraud," which, if established, result in fraudulent intent being presumed, shifting the burden to the Debtor to show that the transfer was not fraudulent. Id. A badge of fraud arises in circumstances "so frequently attending [a] fraudulent transfer[] that an inference of fraud arises." United States v. Isaac, 968 F.2d 1216, 1992 WL 159795, at *4 (6th Cir. 1992) (unpublished). Under Ohio law, badges of fraud are:

> (1) Whether the transfer or obligation was to an insider;
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
> (3) Whether the transfer or obligation was disclosed or concealed;
> (4) Whether before the transfer was made or the obligation incurred, the debtor had been sued or threatened with suit;
> (5) Whether the transfer was of substantially all of the assets of the debtor;
> (6) Whether the debtor absconded;
> (7) Whether the debtor removed or concealed assets;
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

O.R.C. § 1336.04(B). Bankruptcy courts in the Sixth Circuit have recognized many of the above badges of fraud. See e.g., In re Gabor, 280 B.R. at 156. While one badge of fraud may only raise the court's suspicion of a debtor, "the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of the debtor's legitimate supervening purpose." Id. at 157.

In some cases, courts have shifted the burden of proof from the plaintiff to the defendant only after illustrating a few badges of fraud *and* a showing that the transfer was without adequate consideration. See Green v. Stevenson (In re Stevenson), 69 B.R. 49 (Bankr. E.D. Mo. 1986) (cited in Schilling v. Heavrin (In re Triple S Restaurants, Inc.), 422 F.3d 405, 414–15 (6th Cir. 2005)). However, in 2005 the Sixth Circuit decided that if a sufficient number of badges of fraud are present, "the burden of proof may shift even where consideration has not been shown to be inadequate." In re Triple S Restaurants, Inc., 422 F.3d at 416 (holding that the burden of proof in a fraudulent conveyance action shifted to the debtor when the trustee was able to show that the transfer benefited the debtor's close family members and a corporate insider, even without a showing that the transfer lacked reasonable equivalence). Once the burden of proof has transferred to the debtor, if he cannot offer a legitimate reason for the transfer, actual fraud will be shown. See In re Gabor, 280 B.R. 158; Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 794 (Bankr. S.D. Ohio 2009).

In the current case, Trustee has shown a sufficient number of badges of fraud to create a presumption of actual fraud. The badges of fraud present in this case are:

(1) The transfer was made in the face of litigation as well as the threat of additional future litigation.
(2) Debtor was insolvent at the date of the transfer or the transfer made Debtor insolvent.
(3) The transfer was made without receiving reasonably equivalent value.
(4) The transfer was of substantially all of Debtor's assets. According to Schedule B of Debtor's bankruptcy petition, Debtor's total personal property as of the date of the petition was $6,475. As Debtor's one-half interest in the equity in the Real Estate was $132,853,[8] Debtor transferred approximately 95% of her property in the Divorce Agreement.
(5) Debtor obtained a waiver of future child support obligations to the detriment of current creditors. Debtor's actions amount to accelerating an unmatured, future obligation and allowing her to prepay it. Assets that were immediately available, equity in the real estate, were traded for a future obligation that has not yet come due.

---

[8] The $132,853 valuation may change based on the court's interpretation of the Cerny Appraisal. Even viewing the Cerny Appraisal in the light most favorable to Defendant, Debtor still transferred substantially all of her assets.

18

This is little different than allowing a debtor to prepay ten years of rent or any other future expense saving tactic at the expense of current creditors holding liquidated, matured debts. While this action has not previously been listed as a badge of fraud, under the particular facts of this case, the court finds the transaction increases the overall likelihood of actual fraudulent intent.

This court finds that a sufficient number of badges of fraud are present to create a presumption of actual fraud. In a similar case, this court found a presumption of actual fraud when there was (1) actual litigation and threatened litigation against the debtor; (2) the debtor made the transfer while insolvent; (3) there was not fair consideration for the transfer; and (4) the transfer was made to a person with a special relationship to the debtor. In re Gabor, 280 B.R. at 158. The similarity between the current case and In re Gabor strengthen this court's belief that a presumption of actual fraud is appropriate.

Defendant attempts to rebut the presumption by stating that Defendant's acts did not lead to Debtor's civil litigation, but Defendant's actions are not at issue. Section 548 of the bankruptcy code states that a fraudulent transfer will occur when "the *debtor* voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay or defraud." 11 U.S.C. § 548(a)(1)–(a)(1)(A) (emphasis added). Defendant's intent is not the issue in this case, Debtor's intent is. Defendant also dedicates a significant amount of time to illustrating that reasonably equivalent value was given. However, reasonable equivalence is not the issue under a theory of actual fraud, the issue again is the actual intent of Debtor.[9] Defendant has not raised any arguments that could rebut the presumption of actual fraud against Debtor. Therefore, Trustee has satisfied all of the elements of an actual fraudulent transfer and summary judgment is appropriate.

### III.  The Value Defendant is Required to Pay to Trustee

As noted above, Trustee succeeds on her claims for an actual fraudulent transfer and a constructively fraudulent transfer. After deciding that Trustee is entitled to summary judgment, the court will now determine what portion of the Real Estate should be returned to Debtor's bankruptcy estate.

Defendant argues that the amount he should have to return to Debtor is small (or nonexistent) because the value of the Real Estate should be reduced by the cost of selling the property, the mistake in the Cerny Appraisal, and the portion of the Real Estate that is separate property. He further argues that after making the above deductions, Debtor received reasonably equivalent value through the release of her obligation to pay child support and Defendant's assumption of her unsecured debts. As noted above, this court will allow the deduction associated with selling the Real Estate. Additionally, a genuine issue of material fact exists as to the value of the Depot Street property, and consequentially Debtor's equity in the Real Estate.

Based on the uncertainty in the Cerny Appraisal, this court is unable to put a final value on the Real Estate as of the date of the Divorce Agreement. Based on the differences in the

---

[9] Reasonable equivalence is one of the badges of fraud a court can look at when determining if a presumption of fraud has been established, but such a showing is not necessary.

Cerny Appraisal, the Real Estate's fair market value is either $390,755, $345,755, or $320,755.[10] After subtracting the undisputed mortgage debt of $125,050, the Real estate has equity of $265,705, $220,705, or $195,705. As the Real Estate is marital property, Debtor has a one half interest in the equity of the Real Estate in the amounts of $132,853, $110,353, or $97,853. After subtracting one half of the sales expense of $19,538, $17,288, or $16,038,[11] Debtor's interest in the Real Estate is either $113,315, $93,065, or $81,815. Therefore, while the court is unable to make a final determination of the exact amount transferred, looking at the facts in the light most favorable to Defendant still results in a transfer where Defendant receives $81,815 more than would be reasonably equivalent.

## IV.    Defendant's Outstanding Motions

Defendant has three pending motions pertaining to discovery, all of which Trustee has objected to. The motions are: (1) Defendant's motion to extend time for discovery and filing of dispositive motions; (2) Defendant's motion to strike Trustee's appraisal of the Real Estate; and (3) Defendant's motion to extend time or stay the time period for filing a responsive memorandum to Trustee's summary judgment motion. When dealing with discovery matters, a court is granted substantial discretion. Misco, Inc. v. United States Steel Corp., 784 F.2d 198, 206 (6th Cir. 1986).

Defendant's motion to extend time for discovery and filing of dispositive motions ("Discovery Extension Motion") argues that the dispute regarding the valuation in the Cerny Appraisal makes it necessary for Defendant to depose Trustee and obtain his own appraisal. Defendant further argues that his extension should be granted because he originally scheduled a deposition of Trustee, but later decided to remove the deposition and wait until the Cerny Appraisal was received so Trustee would not need to be deposed twice, therefore saving money. Trustee objects to Defendant's motion by arguing that Defendant had plenty of time, especially considering the three discovery extensions approved by this court, to depose Trustee and obtain his own appraisal. A court's decisions limiting discovery will generally be upheld unless they result in "an abuse of discretion resulting in substantial prejudice." Doe v. Lexington-Fayette Urban Cnty. Gov't, 407 F.3d 755, 765 (6th Cir. 2005). In Lexington-Fayette, plaintiff's "failure to procure the depositions of certain parties out of their own perceived 'professional courtesy' in the face of a deadline of which all parties were aware    . . . [is] the Plaintiffs' own loss." Id. (alteration in original). In the case at bar, Defendant did not obtain Trustee's deposition or obtain his own appraisal of the Real Estate based on a desire to save money. While this court notes the importance of making smart economic decisions during discovery, this court will not extend discovery every time a party makes a decision that the cost of obtaining certain information outweighs that information's benefit, but later changes its mind when new information becomes available after the discovery deadline. An equally likely scenario, apart from saving money, is Defendant's attempt to gain some tactical advantage by seeing opposing counsel's appraisal before obtaining his own. In this scenario, Defendant would be relying on the court's anticipated

---

[10] The value of the Cerny Appraisal, less the Depot Street property, is $220,755. The three different Depot Street valuations of $170,000, $125,000 and $100,000, when added to the undisputed values of the other pieces of property included in the Real Estate, arrive at the above figures.

[11] Because the sales expense is 10% of fair market value of the property, this amount changes based on the value of the Depot Street property.

boundless patience towards discovery matters. Patience should not be boundless when it may be used to obtain a tactical advantage. Defendant's Discovery Extension Motion is denied.

Additionally, the court reiterates that discovery has already been extended three times. Although the extensions were filed by Trustee, it is apparent that they were made with Defendant's knowledge and acquiescence. Originally, discovery was to conclude by April 30, 2013. It was then extended to May 10, 2013, purportedly to take Defendant's deposition at a mutually convenient time. Then it was extended to May 20, 2013 to allow Defendant the opportunity to depose Trustee. The last extension, through June 3, 2013, was given to allow Defendant additional time to provide documents and to allow Mr. Cerny to complete his appraisal. Defendant's fourth motion, seeking additional time to obtain an appraisal, is unwarranted.

The value of the property has been at issue since the filing of the complaint. Paragraph (i)(b) of the prayer for relief requests either the return of the property of the estate or "judgment against said Defendant in an amount equal to the value of the Real Property, plus interest and costs." Defendant raised multiple arguments focused on his vision of reasonably equivalent value for Debtor's interest in the property. Defendant's post-discovery attempt to nail down this value is perplexing.

The court is cognizant of the relatively short discovery period in this adversary. It is also aware that the proceeding has been pending less than a year. The pace is frequently brisk in relatively uncomplicated matters in bankruptcy courts in order to conclude matters and allow parties to move on with their lives. There is no reason this work could not have been accomplished in this time. The court remains undiverted from the notion that Defendant's request for additional discovery is not born from a time inadequacy or unexpected discovery complications. Rather, the court is convinced the issue results from Defendant's choices in conducting discovery.

Defendant's motion to strike Trustee's appraisal of the Real Estate ("Motion to Strike") argues that the Cerny Appraisal should be stricken from the record as it was not received by Defendant until June 4, 2013, which was one day after the discovery deadline. Trustee argues that she was under no requirement to submit the Cerny Appraisal to Defendant because: (1) the court did not order that the parties exchange expert reports; or (2) Defendant never served Trustee with a discovery request. This court notes that Federal Rule of Civil Procedure 26, made applicable by Federal Rule of Bankruptcy Procedure 7026, requires a party, "without awaiting a discovery request, [to] provide to the other parties . . . a computation of each category of damages," including materials on which the computation is based. Because the Cerny Appraisal is used to calculate the amount that was fraudulently transferred in the Divorce Agreement, it falls within the category of items that must be provided to opposing counsel without a discovery request. While Trustee was late in providing the Cerny Appraisal to Defendant, this court has the discretion to allow or disallow late filings. See Great Am. Ins. Co. v. United States, 552 F.Supp. 2d 703, 706 (S.D. Ohio 2008) (holding that the court had the discretion to accept a motion for summary judgment filed one and one-half months late because the moving party did not act in bad faith and there was no prejudice to the nonmoving party). In the current case, there is no evidence that Trustee acted in bad faith by submitting the Cerny Appraisal one day after the

discovery deadline. Defendant also was not prejudiced by Trustee's late filing of the Cerny Appraisal. Trustee's complaint filed on November 1, 2012 clearly stated that the value of the Real Estate would be a central issue. Defendant had approximately four months to conduct discovery, giving him enough time to obtain his own appraisal if he so desired. Finally, Trustee submitted the Cerny Appraisal only one day after the discovery deadline. Based on the above, and under the bankruptcy court's substantial discretion pertaining to discovery matters, Defendant's Motion to Strike is denied.

Defendant's motion to extend time or stay the time period for filing a responsive memorandum to Trustee's summary judgment motion ("SJ Extension Motion") argues that Defendant should not have to reply to Trustee's motion for summary judgment until Defendant's Discovery Extension Motion has been ruled upon. Defendant's main argument is that the late receipt of the Cerny Appraisal put Defendant at a disadvantage, and he should therefore receive additional time to draft his memorandum in opposition to Trustee's motion for summary judgment. Trustee filed an objection arguing that Defendant has not provided a legitimate basis for why he cannot respond to Trustee's motion for summary judgment in the normal fourteen day period ending on July 1, 2013. This court notes that Defendant submitted his memorandum in opposition to Trustee's motion for summary judgment on the July 1, 2013 deadline. As noted above, a court's decisions limiting discovery will generally be upheld unless they result in "an abuse of discretion resulting in substantial prejudice." Lexington-Fayette, 407 F.3d at 765. This court finds that Defendant had the standard amount of time to draft his objection to Trustee's summary judgment motion, as well as the entire discovery period to obtain his own appraisal. Defendant's decision not to obtain his own appraisal does not result in substantial prejudice. Defendant's SJ Extension Motion is denied.

**V.     Conclusion**

For the foregoing reasons, the court recommends that Trustee be granted summary judgment against Defendant for Debtor's portion of equity that was fraudulently transferred pursuant to § 548(a)(1)(A) and § 548(a)(1)(B). As noted above, the value of the Depot Street property is subject to a genuine issue of material fact. Excluding the Depot Street property, the Real Estate is valued at $220,755 with a corresponding mortgage debt of $125,050, leaving $95,705 in equity. One half of the equity belongs to Debtor ($47,853). Defendant is able to deduct $11,038 for Debtor's half of the 10% sales expense based on the fair market value of the Real Estate without the Depot Street property. After allowing the deduction, Debtor fraudulently transferred $36,815 to Defendant, along with one half of the value of the Depot Street property to be determined at a later date (less the corresponding 10% sales expense deduction). A hearing will be scheduled to determine the value of the Depot Street property.

The court submits these proposed findings of fact and conclusions of law to the United States District Court.

#       #       #

22

**Service List**:

**Anne Piero Silagy**
220 Market Ave South
Suite 900
Canton, Oh 44702

**John J Rutter**
Roetzel & Andress, LPA
222 S. Main Street
Akron, OH 44308

**Bruce R Schrader, II**
Roetzel & Andress
222 S Main St
Suite 400
Akron, OH 44308

**Andy Charles Morris**
841 Depot Street
Glenmont, OH 44628

**James M Richard**
Richard Law Office, LLC
P.O. Box 1207
127 East Liberty Street
Suite 100
Wooster, OH 44691